## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERWIN GRAMPP, derivatively on behalf of JBI, INC.,<br><br>                        Plaintiff,<br><br>      v.<br><br>JOHN BORDYNUIK and RONALD C. BALDWIN,<br><br>                        Defendants,<br><br>      and<br><br>JBI, INC.<br><br>                        Nominal Defendant. | Civil Action No.: 1:13-cv-11906-MLW<br><br><br><br><br><br><br>__JURY TRIAL DEMANDED__<br><br>__Leave to File Granted on June 23, 2014__ |

### VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Erwin Grampp ("Plaintiff"), by the undersigned attorneys, submits this Verified Amended Shareholder Derivative Complaint against the defendants named herein.

### NATURE OF ACTION

1.      This is a shareholder derivative complaint brought on behalf of the Nominal Defendant, JBI, Inc. ("JBI" or the "Company"), against certain of the Company's former executive officers and members of its Board of Directors (the "Board"). Company founder, former Chief Executive Officer ("CEO") and current Chief of Technology John Bordynuik ("Bordynuik") and former Chief Financial Officer ("CFO") Ronald C. Baldwin ("Baldwin" and together with Bordynuik, the "Individual Defendants") breached their fiduciary duties by knowingly booking media credits in violation of generally accepted accounting principles ("GAAP"). Specifically, the Individual Defendants caused the Company to erroneously book the

media credits at a value of $9.997 million, thereby becoming the single largest asset on the Company's balance sheet, when they should have been initially booked at a value of $1,000,000 when acquired in August 2009, and subsequently written down to zero as of the end of the company's third fiscal quarter on September 30, 2009.

2.      The Individual Defendants' willful misconduct resulted in the filing of a complaint against JBI by the Securities and Exchange Commission ("SEC") on January 4, 2012 (the "SEC Complaint" or the "SEC Action").  The Company and the SEC ultimately entered into a settlement on January 23, 2014 wherein the Company and Bordynuik consented to the entry of orders enjoining them from future violations of certain provisions of the federal securities laws (including the antifraud, reporting, and books and records provisions), and required the Company and Bordynuik to pay civil penalties of $150,000 and $110,000, respectively. The SEC order against Bordynuik also included a five-year officer/director bar.

3.      The SEC Complaint charges Bordynuik and Baldwin with knowingly engaging in a scheme to commit securities and accounting fraud by knowingly reporting materially false and inaccurate financial information on JBI's financial statements for two reporting periods during 2009.

4.      According to the SEC Complaint, during the third and fourth quarter of 2009, the Individual Defendants willfully caused the Company to materially overstate certain assets in an effort to bolster its balance sheet and achieve success in two private capital raising efforts (Private Investment in Public Equity or PIPES) geared toward raising the capital necessary to begin commercial operation and production of its process for converting plastic waste into oil, known as "Plastic2Oil," or "P2O."  The SEC Complaint asserts that JBI illicitly raised over $8.4 million for the Company in PIPES just before the Company issued a public statement indicating

its financial statements could no longer be relied upon, in part, due to the erroneous valuation of certain assets, known as media credits, on the balance sheet.

5.      As a result of the materially false and misleading statements set forth herein and in the SEC Complaint, the Individual Defendants have subjected JBI to a lawsuit alleging violations of the federal securities laws, captioned *Howell, v. JBI., et al*, 11-cv-00545 (D. Nev., filed July 28, 2011) ( the "Securities Class Action").  The Company is currently in the midst of settling the Securities Class Action.

6.      As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, JBI has sustained significant damages, including, but not limited to, the costs associated with restating JBI's financial statements, the cost of defending the SEC Action, including any indemnification costs for Bordynuik and Baldwin, the $150,000 fine levied against the Company as a result of the final judgment in the SEC suit, the cost of defending the Securities Class Action and the impending amount of settlement, and the costs incurred for finding and recruiting new executives and directors due to the removals required by the SEC final judgment.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

8.      JBI is a Nevada corporation, with its current principal place of business in Niagara Falls, New York.  Up through July of 2010, and for a majority of the period relevant to this action, JBI's principal place of business was Cambridge, Massachusetts.  JBI then moved its principle place of business to Thorold, Ontario, Canada (just west of Niagara Falls) from the

period of July 2010 to November 2012.  Now, as then, JBI also has operations in New York, Florida, Ohio, and Pennsylvania.  The defendants had substantial and continuous contacts with the Commonwealth of Massachusetts that make the exercise of personal jurisdiction over them proper.

9.     Venue is proper in this district for many reasons.  First, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  The defendants were officers and/or directors of JBI, whose principal place of business was located in this district when the alleged wrongful acts occurred.   The defendants are alleged to have breached their fiduciary duties in connection with the issuance of false and misleading statements concerning asset valuation and accounting practices, which emanated from this district.  For example, false and misleading statements were made in the Company's November 16, 2009 Form 10-Q (for the third quarter ended September 30, 2009) and its March 31, 2010 Form 10-K (for the year ended December 31, 2009), which originated in this district and were signed by the defendants.

10.     Second, the defendants, as officers and/or directors, regularly attended board meetings in this district.   Pursuant to their responsibilities as directors and/or officers, the defendants have continuing contacts with this district through means such as emails or phone calls which subjects them to the jurisdiction of this Court.

11.     Third, during the period when the majority of the alleged wrongdoing took place, one or more of the defendants either resided or maintained executive officers in this district.

12.     Fourth, defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.  The defendants, as officers and/or directors, have purposely availed themselves of the

4

privilege of conducting business in this district by receiving salaries and fees from JBI, which was located in this district when the majority of the alleged wrongdoing took place.

## PARTIES

13.     Plaintiff, Erwin Grampp, a citizen of the Commonwealth of Pennsylvania, is a shareholder of JBI, was a shareholder of JBI at the time of the wrongdoing alleged herein, and has been a shareholder of JBI continuously since that time.

14.     Nominal Defendant JBI is a Nevada corporation with its principal executive offices located at 20 Iroquois Street, Niagara Falls, New York, 14303.  JBI is a North American technology company that allegedly transforms unsorted, unwashed waste plastic into ultra-clean, ultra-low sulphur fuel without the need for refinement and engages in data recovery and migration.

15.     Defendant Bordynuik is the founder, former CEO and President, and current Chief Technology Officer of JBI.  He was also the CFO of JBI from March 2011 to December 19, 2011 and previously from April 24, 2009 to December 31, 2009.  Bordynuik was a director of JBI from April 24, 2009 to May 15, 2012, when he was forced to resign that post as well as his titles as CEO and President pursuant to the terms of the settlement of the SEC Action. Bordynuik allegedly invented the Plastic2Oil process in 2009.  Bordynuik is a citizen of the State of New York.

16.     Defendant Baldwin was CFO of JBI from January 1, 2010 to April 6, 2011, when he resigned his position with JBI.   Baldwin is a CPA with 15 years experience in public accounting.   He is licensed to practice accounting in Florida and North Carolina and was formerly licensed to practice law in Florida.  Mr. Baldwin holds a B.S. in Accounting magna cum laude from the University of South Florida and a J.D. and L.L.M in Taxation cum laude

from the University of Florida.  Baldwin was admitted to the Florida Bar in 2000, although his

license was suspended on October 31, 2009.  Baldwin is a citizen of the State of Florida.

<u>**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**</u>

17.     By reason of their positions as officers and/or directors and fiduciaries of JBI and

because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed to JBI and its shareholders fiduciary obligations of trust, loyalty,

good faith, and due care, and were and are required to use their utmost ability to control and

manage JBI in a fair, just, honest, and equitable manner.  The Individual Defendants were and

are required to act in furtherance of the best interests of JBI and its shareholders so as to benefit

all shareholders equally and not in furtherance of their personal interest or benefit.  The conduct

of the Individual Defendants complained of herein involves a knowing and culpable violation of

their obligations as directors and officers of JBI, the absence of good faith on their part, and a

reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware posed a risk of serious injury to the Company.

18.     To discharge their fiduciary duties, Bordynuik and Baldwin were required to

exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the Company.  By virtue of such duties, the Individual Defendants were required to, among

other things:

      a)  Manage, conduct, supervise, and direct the business affairs of
           JBI in accordance with all applicable laws, including federal
           and state laws and regulations, and the policies of the
           Company;

      b)  Neither violate, nor permit any officer, director or employee of
           JBI to violate applicable laws, rules, and regulations;

      c)  Remain informed as to the status of JBI's operations, including
           its internal audit capabilities and the laws which bear on the

Company's business endeavors, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

d)   Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

19.    JBI has a Code of Business Conduct and Ethics which was enacted when the Company was known as 310 Holdings, Inc. ("310 Holdings").   According to the Company's Code of Ethics:

310 Holdings, Inc. (the "Company")[currently known as JBI] is committed to the highest standards of legal and ethical conduct. This Code of Business Conduct and Ethics (the "Code") sets forth the Company's policies with respect to the way we conduct ourselves individually and operate our business. The provisions of this Code are designed to deter wrongdoing and to promote honest and ethical conduct among our employees, officers and directors.

\*       \*       \*

In achieving the high ground of ethical behavior, compliance with governmental laws is not enough. Our employees should never be content with simply obeying the letter of the law, but must also strive to comport themselves in an honest and ethical manner. This Code provides clear rules to assist our employees, directors and officers in taking the proper actions when faced with an ethical dilemma.

\*       \*       \*

The reputation of the Company is our greatest asset and its value relies on the character of its employees. In order to protect this asset, the Company will not tolerate unethical behavior by employees, officers or directors. Those who violate the standards in this Code will be subject to disciplinary action.

\*       \*       \*

This Code applies equally to all employees, officers and directors of the Company. All references to employees contained in this

7

Code should be understood as referring to officers and directors as well.

20.     The Company's Code of Ethics then goes on to state:

**1.        <u>Compliance with Laws, Rules and Regulations.</u>**

Company policy requires that the Company, as well as all employees, officers and directors of the Company, comply fully with both the spirit and the letter of all laws, rules and regulations. Whenever an applicable law, rule or regulation is unclear or seems to conflict with either another law or any provision of this Code, all employees, officers and directors are urged to seek clarification from their supervisor, the appropriate compliance official or the Chief Executive Officer. Beyond mere compliance with the law, we should always conduct our business with the highest standards of honesty and integrity - wherever we operate.

**8.        <u>Disclosures.</u>**

It is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws, rules and regulations in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Company. Employees shall endeavor in good faith to assist the Company in such efforts.

**11.       <u>Reporting Procedures.</u>**

All employees have a duty to report any violations of this Code, as well as violations of any laws, rules, or regulations. The Company does not permit retaliation of any kind against employees for good faith reports of ethical violations.

If you believe that the Code has been violated by an <u>employee</u> you must promptly report the violation to your direct supervisor or the Chief Executive Officer. If a report is made to a supervisor, the supervisor must in turn report the violation to the Chief Executive Officer. All violations by an <u>officer or director</u> of the Company must be reported directly to the entire Board of Directors.

**15.       <u>Financial Code of Ethics</u>**

As a public company, it is of critical importance that 310 Holdings filings with the Securities and Exchange Commission be accurate and timely. Depending on their position with 310 Holdings,

employees may be called upon to provide information to assure that 310 Holdings' public reports are complete, fair, and understandable. 310 Holdings expects all of its employees to take this responsibility seriously and to provide prompt and accurate answers to inquiries related to 310 Holdings' public disclosure requirements.

310 Holdings' Finance Department, when established, will bear a special responsibility for promoting integrity throughout 310 Holdings, with responsibilities to stakeholders both inside and outside of 310 Holdings. The Chief Executive Officer, Chief Financial Officer, and Finance Department personnel have a special role both to adhere to the principles of integrity and also to ensure that a culture exists throughout 310 Holdings as a whole that ensures the fair and timely reporting of 310 Holdings' financial results and conditions. Because of this special role, the CEO, CFO, and all members of 310 Holdings' Finance Department are bound by 310 Holdings' Financial Code of Ethics, and by accepting the Financial Code of Ethics, each agrees that they will:

- Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.

- Provide information that is accurate, complete, objective, relevant, timely and understandable to ensure full, fair, accurate, timely, and understandable disclosure in the reports and documents that 310 Holdings files with, or submits to, government agencies and in other public communications.

- Comply with the rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies.

- Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.

- Respect the confidentiality of information acquired in the course of one's work, except when authorized or otherwise legally obligated to disclose. Confidential information acquired in the course of one's work will not be used for personal advantage.

- Share job knowledge and maintain skills important and relevant to stakeholders needs.

- Proactively promote and be an example of ethical behavior as a responsible partner among peers, in the work environment and in the community.

- Achieve responsible use of, and control over, all 310 Holdings assets and resources employed by, or entrusted to yourself, and your department.

- Receive the full and active support and cooperation of 310 Holding's Officers, Sr. Staff, and all employees in the adherence to this Financial Code of Ethics.

- Promptly report to the CEO or CFO any conduct believed to be in violation of law or business ethics or in violation of any provision of this Code of Ethics, including any transaction or relationship that reasonably could be expected to give rise to such a conflict. Further, to promptly report to the Chair of 310 Holdings' Audit Committee such conduct if by the CEO or CFO or if they fail to correct such conduct by others in a reasonable period of time.

21.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of JBI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and directorial positions with JBI, each of the Individual Defendants had access to material non-public information about the financial condition, operations, and practices of JBI.

## FACTUAL ALLEGATIONS

### Bordynuik's Control of the Company

22.     As the eponymous "JB" in JBI and founder of JBI and the P2O process, Defendant Bordynuik has, since the Company's beginnings in 2005 through today, remained the primary technological pioneer behind the Company and remained deeply entrenched in his namesake Company's management and operations.  In addition to his former roles as CEO, CFO, President, and Chairman of the Board, and his current position as Chief of Technology,

Defendant Bordynuik is the principal stockholder of the Company, owning approximately 50.65% of the voting power of the Company's share capital.

23.     The Company's ownership structure consists of two classes of stock, common stock, which is held by both Bordynuik and by the public, and Series A Super Voting Preferred Shares, consisting of 1,000,000 shares owned exclusively by Bordynuik.   These Series A Super Voting Preferred Shares have voting rights that are 100 times the voting rights of common stock.

24.     At the most recent annual meeting of shareholders, common stock, which is traded on the OTCQB Market under the symbol "JBII," and the Series A Super Voting Preferred Shares (voting at 100 times the power) were entitled to elect all of the Company's directors. Shares of common stock were prohibited from being voted cumulatively.   Accordingly, as the owner of all Series A Super Voting Preferred Shares, Bordynuik singlehandedly designates all of the Company's directors.   He regularly "voted" himself into such a director role until he prevented from doing so via an SEC final decree.

25.     The three directors appointed by Bordynuik at the July 23, 2012 shareholder meeting were John Wesson ("Wesson"), Matthew Ingham ("Ingham'), and Kevin Rauber ("Rauber").   Only one of them is currently a director, Ingham, who also serves as JBI's CFO. Wesson resigned from the Board on April 19, 2013 for undisclosed reasons.   Rauber resigned from the Board and his position as President and CEO of Company on May 1, 2013 for undisclosed reasons.     Consequently, Tony Bogolin ("Bogolin"), who was serving as Chief Operating Officer ("COO") of the Company was appointed to the positions of President, CEO, and director.   Currently the Board is comprised solely of CEO Bogolin and CFO Ingham.

26.     Bordynuik's far-reaching influence and dominance as founder, former President, CEO, CFO, and Chairman of the Board, current Chief of Technology, and controlling

shareholder of the Company is not limited to determining who sits in the boardroom.   Bordynuik

also has ensured that his voice alone speaks for all shareholders in votes that are brought to the

Company's shareholders as a whole.   As the Company candidly states in its March 15, 2013

Form 10-K (for the year ended December 31, 2012) ( the "2013 From 10-K"):

> [Bordynuik] is able to exert a significant degree of influence over matters
> requiring shareholder approval, including the election of directors, any
> amendments to our articles or by-laws and significant corporate transactions. The
> interests of this concentration of ownership may not always coincide with the
> Company's interests or the interests of other stockholders. For instance, officers,
> directors, and principal stockholders, acting together, could cause the Company to
> enter into transactions or agreements that it would not otherwise consider.
> Similarly, this concentration of ownership may have the effect of delaying or
> preventing a change in control of the Company otherwise favored by our other
> stockholders. This concentration of ownership could depress our share price.

### Company Background

27.      In 2005, Defendant Bordynuik was the founder and head of a data recovery and

restoration company called John Bordynuik, Inc.    Bordynuik had developed software that

facilitated the recovery of archived institutional data stored on old magnetic media.    John

Bordynuik, Inc. sold and developed that software.

28.      Through a series of related transactions, John Bordynuik, Inc. would become JBI.

At all times during the existence of John Bordynuik, Inc., and its successor entities, including

JBI, Bordynuik headed the Company's business operations, including third party transactions.

29.      JBI is a development stage company which claims to have found the recipe for an

inexpensive catalyst which, when used in the process of heating waste plastic to high

temperatures in the absence of oxygen, a process commonly known as pyrolysis, can purportedly

produce a crude oil equivalent for a total cost of under $10 per barrel.  The Company named this

process "Plastic2Oil" or "P2O."   The Company further claims that refineries have offered to

purchase the oil product for just a few dollars under the price of West Texas Intermediate crude

oil, a price which currently sits above $103 per barrel.  As per Defendant Bordynuik's public statements in 2009, each processor will cost around $80,000, will be able to produce 109 barrels of this crude oil equivalent per day and can be constructed so quickly that Bordynuik said the Company's "plan is to launch 2,500 sites over the next few years."[1]

30.     In fact, Bordynuik has kept the fabled catalyst a secret and so far he has been reluctant to provide any evidence whatsoever of commercial viability.

31.     Regardless, investors loved the story and in early 2010, JBI's stock jumped from around $1.00 to over $7.00 per share almost overnight.  Bordynuik ensured that the story did not go unnoticed, putting out nineteen press releases in a single day on February 12, and working with a number of stock promotion sites to raise awareness of the Company.

32.     On or around April 24, 2009, Bordynuik acquired a majority interest in and became the CEO and CFO of an existing shell company known as 310 Holdings, Inc., a Nevada corporation.

33.     On July 15, 2009 in a purportedly arm's length transaction, 310 Holdings purchased the assets of John Bordynuik, Inc.  The Company's assets at that time consisted mostly of data recovery equipment.  However, in various public filings dating back to at least late 2009, the Company claimed to have developed a commercial process capable of converting plastic waste into oil, known as "Plastic2Oil."

**The Individual Defendants Cause the Company To Improperly Value Media Credits and Engage in Other Accounting Violations**

34.     On August 24, 2009, 310 Holdings purchased 100% of the outstanding shares of Javaco, Inc. ("Javaco").  Javaco was a wholly owned subsidiary of Domark International

---

[1] *See* http://seekingalpha.com/article/319080-john-bordynuik-revolutionary-company-or-can-of-worms

("Domark").   310 Holdings paid $150,000 in cash and issued 2,500,000 shares of 310 Holdings' common stock as payment for the acquisition of Javaco.   Bordynuik announced that Javaco was acquired to operate and manage the Company's Plastic2Oil processing sites in Mexico.   Pursuant to a separate agreement, Domark's CEO sold and/or assigned media credits (the "Media Credits") to 310 Holdings.   The Media Credits purportedly allowed their holder to purchase $9,997,134 worth of prepaid advertising and marketing promotions.   As consideration for the assignment of the Media Credits, 310 Holdings issued 1,000,000 shares of common stock valued at $1,000,000 total ($1.00 a share as of August 24, 2009).

35.     Also in late 2009, Bordynuik wrote agreements and contracts to build 45 of his Plastic2Oil sites in cooperation with a major developer in Florida, to build shipboard processors which would clean up the Pacific garbage patch as well as process plastic waste generated on islands, and to set up three joint ventures with other parties to build Plastic2Oil sites in Ohio and Florida.

36.     A month later, Bordynuik acquired a Florida company called Pak-it, LLC for $4.6 million in stock and notes.   Pak-it, LLC had a subsidiary named Dickler Chemical Laboratories which was in the business of manufacturing and selling industrial cleaning products. Neither the Javaco nor Pak-it acquisitions made sense in light of trying to commercialize P2O.   Together, their operations generated net losses, but they certainly made JBI look bigger.   For a company which had no assets a couple of months earlier that was significant and the acquisitions helped Bordynuik in his effort to make JBI look like a successfully growing company

37.     On October 5, 2009, 310 Holdings changed its name to JBI, Inc. and Bordynuik, in his controlling seat of power, named himself CEO and CFO of the newly named company.   As such Bordynuik certified all of JBI's financial statements including those filed with the Form 10-

Q for the period ending September 30, 2009 that was filed on November 16, 2009 and the financial statements included with the form 10-K for the year ended 2009 filed on March 31, 2010. Both the Form 10-Q and the Form 10-K were filed with the SEC. In addition, the Form 10-K was certified by Defendant Baldwin and signed by defendants Bordynuik and Baldwin.

38.     In both its third quarter financial statements filed in the Form 10-Q on November 16, 2009 (for the third quarter ended September 30, 2009) and its end of year financial statements filed in the Form 10-K on March 31, 2010 (for year ended December 31, 2009), JBI reported the value of the Media Credits purchased from Domark to be $9,997,134, their purported face value.

39.     The valuation of the Media Credits certified by both Bordynuik and Baldwin was false, misleading and contrary to GAAP. Bordynuik certified both the third quarter 2009 10-Q and the year end 2009 10-K. Because he was not yet the CFO during the third quarter of 2009 Baldwin only certified the year end 2009 10-K. Bordynuik and Baldwin knew the valuation was false and inaccurate when they certified the 10-Q and 10-K, and they did so with the intent to mislead and deceive JBI investors as to the true net worth of the Company.

40.     The $9,997,134 valuation was allegedly based on the price that Domark supposedly paid for the Media Credits when it purchased them from a company called Media4Equity LLC ("Media4Equity") on August 13, 2008. However that valuation was severely flawed given JBI had paid $1 million to purchase the Media Credits on the open market. As such, the $1,000,000 that JBI paid Domark as consideration for the Media Credits was the only basis for valuing the Media Credits and the highest potential value of the Media Credits at the time of the transaction.

41.     The Individual Defendants deliberately mislead investors and the public by using the purported face value of the Media Credits, rather than their actual cost.  In doing so, they caused the Company to overstate the total value of its assets by a minimum of $8,997,134 (the $9,997,134 value reported less the actual $1,000,000 paid) as of both September 30, 2009 and December 31, 2009.

42.     Because the Media Credits constituted JBI's largest asset as listed on their financial statements, the deliberate misstatement of their value served to drastically inflate the value of the Company in the eyes of the investing public, as intended by the Individual Defendants.  The Individual Defendants then used the inaccurate financial statements to obtain more than $8.4 million from private capital investors.

43.     This illegal conduct did not go unnoticed.   On January 4, 2012, the SEC Complaint was filed against JBI, Bordynuik, and Baldwin in the United States District Court, District of Massachusetts. The SEC Complaint alleges that the Media Credits were actually valued at zero as of the close of the reporting periods on September 30, 2009 and December 31, 2009.  Given the unreliability of any future economic benefit attributable to the Media Credits, GAAP required that the Media Credits initially be recorded in JBI's books at the $1,000,000 consideration paid by 310 Holdings on August 24, 2009 and subsequently remeasured on September 30th and December 31st of that year at $0.

44.     In truth, there was no probable economic benefit to JBI from the Media Credits since the ads had limited distribution and would be unlikely to increase sales and profits. Accordingly, by September 30, 2009, Bordynuik and Baldwin knew the Media Credits were in fact worthless.  As such, GAAP required that the Media Credits be written off in their entirety as of September 30, 2009, let alone December 31, 2009.  However, Defendants Bordynuik and

Baldwin did not do this because they knew that without inflating JBI's assets they would be unable to attract the level of investment they desired for the Company to purportedly expand its operations and increase the share price of JBI.

45.    In his public statements since the release of the SEC Complaint, Defendant Bordynuik has insisted that any mistakes in JBI's filings were innocent accounting mistakes and that he had no idea as to the true valuation of the Media Credits.  Bordynuik's statements are not credible.   In reality, Bordynuik and Baldwin took specific steps to make sure their improper valuation of the Media Credits would never be questioned.

46.    Moreover, Bordynuik, per the Company's May 21, 2010 8-K filing, concluded on May 19, 2010 that the Company's September 30, 2009 and December 31, 2009 financials should not be relied upon due to the incorrect valuation of the Media Credits.    Not surprisingly, Bordynuik's discovery coincided with the completion of the Company's private equity fundraising.

47.    Neither JBI nor its predecessor 310 Holdings ever hired a professional accounting firm to assist with its financial reporting.   Instead, Bordynuik hired a woman who was not a certified public accountant and who did not have a formal degree in accounting.  In fact, her only accounting experience was six hours of an accounting class a community college.    Her relationship as a consultant to 310 Holdings continued after it was merged into JBI.

48.    At the time 310 Holdings acquired the Media Credits, Bordynuik had discussions with the consultant about the valuation of the Media Credits and indicated that she was responsible for ensuring that the financial statements valued the Media Credits at the inflated

figure of $9,997,134. Bordynuik sent her an instant message instructing her to "please get the pro formas as juicy as you can so I can acquire a chemical company for less."[2]

49.     Bordynuik intended to use JBI and its inflated balance sheet as a vehicle to obtain more companies.   He also knew and intended that JBI would file "pro formas," financial statements that would not conform to GAAP and would be used to communicate information about JBI to investors.   The consultant followed Bordynuik's instructions and valued the Media Credits at nearly $10 million.

50.     Prior to the filing of the Form 10-Q for the quarter ending September 30, 2009, the consultant expressed concern to Bordynuik about the proper valuation for the Media Credits. The consultant told Bordynuik that she thought GAAP required that the Media Credits be recorded at their cost to JBI of $1 million, as opposed to their face value of $9.997 million. During that same time period, other individuals, including a business consultant (the "Business Consultant") and the CEO of a company that Bordynuik was trying to purchase, informed him that the valuation of the Media Credits contained in the pro formas submitted to investors was incorrect.

51.     By mid-September 2009, and prior to the filing of the third quarter Form 10-Q, Bordynuik learned that Domark's CEO had mislead him about the valuation of both Javaco and the Media Credits in an attempt to induce him to acquire Javaco.   One of the misleading statements made by Domark's CEO which Bordynuik learned about was the fact that the CEO of NewsUSA, the parent company of Media4Equity (the company that originally sold the Media Credits to Domark in what was purported to be an arm's length transaction), was previously a member of the Board of Directors of Domark.   According to the SEC Complaint, the consultant

---

[2] *See* http://seekingalpha.com/article/319080-john-bordynuik-revolutionary-company-or-can-of-worms

informed Bordynuik of the suspect relationship and Bordynuik responded in a message stating, "I saw that. Yuk," but Bordynuik still took no steps to properly value the Medial Credits as required.

52.     The Business Consultant was the Assistant Secretary of JBI who was working on Plastic2Oil projects. He was also a CPA and a former auditor at Deloitte & Touche. He told Bordynuik in clear unambiguous terms that his valuation of the Media Credits was improper and would lead to issues with the SEC. The proper course was to book the Media Credits at the lesser of cost or market value. By booking the Media Credits at an inflated value, Bordynuik was representing that JBI had nearly $10 million in assets, even though the day before JBI had almost no assets on its balance sheet.

53.     Bordynuik's response to these concerns raised by the consultant and the Business Consultant, as well as to similar concerns raised by the former CEO of one of the companies JBI acquired, was to tell the Business Consultant that the Media Credits were "audit proof." Bordynuik's only concern was, as he put it in an e-mail to the consultant, "we need a chemc company bad … " (sic).

54.     Despite having his doubts confirmed as to the value of the Media Credits and the credibility of Domark's CEO's claims regarding the value of Media Credits and the value of Javaco, and despite being warned that his treatment of the Media Credits was contrary to GAAP, Bordynuik improperly directed that the Media Credits on JBI's financial statements contained in its Form 10-Q, filed on November 16, 2009 be listed at a purported value of $9.997 million.

55.     In a continuing attempt to move forward with his scheme, Bordynuik also engaged a sham auditing firm, Gately & Associates, LLC ("Gately, LLC") to serve as JBI's independent auditor. JBI's previous auditor, Moore and Associates Chartered, had their

registration removed by the SEC for violations of auditing standards and regulations.  Gately, LLC also would end up in serious trouble with the SEC and eventually the firm was barred from providing audits to public companies by the Public Company Accounting Oversight Board ("PCAOB") for its failure to cooperate with an inspection by the Board's Division of Registration and Inspections.  Moreover, the firm's principal, James P. Gately, was permanently barred from associating with any registered public accounting firm and the firm's registration was permanently revoked by the PCAOB.

56.    None of this could possibly have been a shock to Bordynuik given Gately, LLC had been inspected by the PCAOB previously and in a March 9, 2006 report was found to be deficient in the following areas:

1) the failure to perform and document, in two of the audits reviewed, audit procedures regarding the proper classification of certain debt instruments;

2) the failure to perform and document, in two of the audits reviewed, sufficient audit procedures with respect to revenue recognition;

3) the failure to perform and document, in two of the audits reviewed, audit procedures to determine whether it was necessary to recognize a beneficial conversion feature;

4) the failure to perform and document audit procedures to test the valuation of an intangible asset acquired in a transaction;

5) the failure to perform and document audit procedures to evaluate the issuer's accounting for a consulting agreement; and

6) the failure to perform and document sufficient audit procedures related to the valuation of acquired in-process research and development.

57.    In addition, James Gately was undergoing treatment for a severe alcohol dependency that allegedly incapacitated him for days or weeks at a time.  Bordynuik was well

aware of Gately's drinking problem and had in fact been warned by his consultant that he should choose a new auditor. Nevertheless, JBI and Bordynuik continued to utilize Gately and his firm as its independent auditor for the September 30, 2009 10-Q filing through the March 31, 2010 filing of the Form 10-K.

58.     Shortly after the filing of the Form 10-Q for the third quarter of 2009 on November 16, 2009, additional issues arose regarding, James Gately, JBI's "independent" auditor at Gately, LLC. On November 28, 2009, Mr. Gately was arrested for a violation of probation, felony driving under the influence, and possession of marijuana. Mr. Gately remained in jail in Florida until February 18, 2010. The consultant informed Bordynuik of the Mr. Gately's incarceration but Bordynuik insisted on continuing to use Gately, LLC for JBI's Form 10-K audit for the fiscal year ending December 31, 2009. Indeed, Bordynuik even agreed to assist the incarcerated auditor by paying for his criminal representation and alcohol treatment program and offering him a job as an internal auditor for JBI's operations in Canada. Thus, Bordynuik offered him legal and financial assistance while he was still retained as the principal of JBI's supposedly independent audit firm.

59.     Despite these issues, and the dissolving of any notion of "independence" between the auditor and Bordynuik, between the period in which JBI's 10-Q for the third quarter of 2009 was filed and the 10-K for the year end was filed on March 31, 2010, Bordynuik and JBI persisted in using Gately, LLC as its "independent" audit firm. Bordynuik later claimed that one of the auditor's colleagues at the Gately firm stepped in to assist with the audit responsibilities while Mr. Gately was incarcerated or otherwise was unavailable due to his drinking problem. However, there is no indication that anyone from Gately, LLC (or otherwise) undertook any review of the final set of consolidated financial statements included in JBI's Form 10-K filed on

March 31, 2010.  In fact, the PCAOB's 2006 Report and 2009 Final Decision both listed James P. Gately as the only employee of Gately, LLC.

60.     In truth, the independent auditing "performed" by Gately was a sham.  It appears that no one associated with JBI ever had any significant contact with Gately prior to the filing of the financial statements.   In fact, there is nothing to show that Bordynuik and Baldwin ever consulted with James Gately about the Media Credits' valuation in advance of the two reporting periods in question.

61.     In an incredible act of hubris, Bordynuik allowed a colleague of James Gately to forge the firm's signature on an audit opinion letter attached to JBI's Form 10-K filing representing that an independent audit had been conducted.   In fact, as Bordynuik and Baldwin planned and knew, no independent audit was ever conducted by Gately, LLC.   Bordynuik and Baldwin then approved and certified JBI's financial statements contained in its year end Form 10-K filed on March 31, 2010 that included the erroneously inflated value of the Media Credits.

62.     Defendant Baldwin reviewed JBI's Form 10-K for the year ended December 31, 2009 prior to its filing on March 31, 2010 and actually expressed concerns to Bordynuik about the valuation of the Media Credits and was fully aware that they were improperly valued.  Baldwin was also aware of the concerns expressed by the Business Consultant.  Baldwin also knew that the Media Credits were the single largest item on JBI's balance sheet.  Despite being aware of all these issues regarding the valuation of the Media Credits, Baldwin failed to exercise any due diligence regarding the appropriate accounting method to value the Media Credits and knowingly improperly certified the financial statements contained in JBI's Form 10-K for the year 2009.

63.     During this time, the Bordynuik controlled Audit Committee and the Board; both groups did exactly what Bordynuik had appointed them to do, applauding his every move without question.

64.     Because of the false statements concerning the Media Credits made by the Defendants Bordynuik and Baldwin and the false and misleading financial statements JBI filed, JBI was able to attract significant private capital from investors that it otherwise would not have been able to attract, as intended by the Individual Defendants.   Beginning in the fall of 2009 through May 2010, JBI raised approximately $8.4 million in capital from private equity investment.   The Individual Defendants used marketing and presentation materials including PowerPoint presentations that represented the Company's assets as including the Media Credits valued at $9.997 million.   The inclusion of the Media Credits on these sales materials and in the Company's public filings served to present a misleadingly strong financial picture of the Company's assets to potential investors.   Defendants Bordynuik and Baldwin knew that the financials and presentation materials for JBI that listed the Media Credits at a value of $ 9.997 million investment did not reflect the Media Credits' actual value and were inconsistent with GAAP and standard independent auditing standards.

65.     Baldwin also made willful misrepresentations about the value of the Media Credits at JBI's annual General Meeting held on April 24, 2010.

66.     Bordynuik and Baldwin also falsely asserted that JBI's financial statements were prepared according to GAAP.

67.     On May 21, 2010, JBI filed a Form 8-K stating that its previously issued financial statements for the year ended December 31, 2009, filed on Form 10-K with the SEC on March 31, 2010, and the interim financial statements for the period ended September 30, 2009, filed on

Form 10-Q with the SEC on November 16, 2009, should no longer be relied upon due, in part, to questions regarding the valuation of the Media Credits acquired by the Company during 2009. On July 9, 2010 and November 17, 2010, the Company issued two restatements.   In these restatements, JBI wrote down the media credits to zero and disclosed that the credits had been improperly valued.   As noted above, the timing of this disclosure coincided with the completion of JBI's private equity fundraising.

**False and Misleading Statements Regarding Plastic2Oil or P2O**

68.     In a separate deception, on July 9, 2009, Bordynuik put out a press release saying the Company "Files Patent Application for Plastic2Oil Technology." A year later in the SEC filings, Bordynuik made no mention of the patent application or the benefits that potential patent protection could provide, effectively admitting that no patent protection was ever sought.

69.     In April 2010, Bordynuik told shareholders that he had an offer from Somerset Refinery to purchase oil from his P2O process for the price of West Texas Intermediate crude oil minus $3 per barrel. The problem—Somerset Refinery had already been shut down for two months when he said it.   Accordingly, the only refinery ever mentioned by Bordynuik as having made an offer for JBI's oil just happened to go out of business prior to allegedly inking a deal with JBI.   No other refinery offering to buy Bordynuik's oil has surfaced in the four years since the announcement.[3]

70.     Since inception, the story of JBI as told by Bordynuik has been very inconsistent and often raised even more eventual questions.   For example, in 2009 Bordynuik put out press releases touting deals to build 45 P2O sites in Florida with Sousa Development, shipboard P2O

---

[3] *See* http://seekingalpha.com/article/319080-john-bordynuik-revolutionary-company-or-can-of-worms

sites with Heddle Marine, three other joint ventures to build P2O sites in Ohio and Florida, agreements to sell naphtha and an agreement to sell pyrolysis-derived fuels to Oxy Vinyls, each and every one of those deals vanished and were never heard from again.   No excuse from Bordynuik was ever given why none ever came to fruition.   Virtually every deal ever announced by Bordynuik fell apart, including Bordynuik's previous quarterly habit of saying that he expected commercial production within one quarter since Q1 2010 and then resetting in every next quarter to say commercial product was still one quarter away.    The only plausible explanation is that, just like the Media Credits and the Somerset Refinery contract, the deals are merely stories made up by Bordynuik to perpetuate his scheme and continue to have investor money flowing into his own pocket.[4]

71.     The unexplained delays in perfecting and implementing the P2O process are also continuous.   In April 2010, Bordynuik announced that the first P2O processor was ready for production, almost a year after he ordered the off-the-shelf processor from a Chinese company named Donghe in mid 2009 which merely had to be assembled.   That same month, Bordynuik made it clear to shareholders that the only step left to commercial operations was getting a simple permit from the New York Department of Environmental Conservation ("NYDEC") to allow him to burn the off-gasses produced as a byproduct of the P2O pyrolysis process.   In June, 2010, during the conference call in response to a question, he reiterated, "As soon as we obtain the air permit we will begin running the processor in full commercial production."   Nine months later (no explanation for the lengthy time needed) he finally filled out the ten-page permit

---

[4] *Id.*

application, and the NYDEC approved it less than three weeks later.  Bordynuik then put out a press release announcing that commercial operations had commenced.[5]

72.     But commercial operations had not and have not commenced.  As of today, over three years after that announcement of commercial operations, there is still no indication that the first processor has been put into productive commercial service.[6]

73.     Bordynuik does, however, list 'P2O' sales to a company called Coco Asphalt. However, in the filings, Bordynuik leaves it very ambiguous as to whether the P2O sales refer to products from his "P2O process," or from the "P2O division."  JBI's P2O division also houses a previously defunct "blending facility" purchased by JBI from a friend of Bordynuik's family. Blending businesses routinely obtain third-party fuel, blend in additives, and then deliver that fuel.  It seems quite possible the "petroleum distillate" was purchased and resold without any ties to the P2O process itself.   Bordynuik himself provides no clarification on this important and material subject.  *Id.*

74.     Looking at JBI's November 21, 2011 Form 10-Q for the third quarter of 2011 ending September 30, 2011, which Bordynuik filed with the SEC, Bordynuik shows the P2O division as having a high gross margin as a percent of sales.  However the P2O division cost of sales he reported for the nine-month period is also oddly less than what he reported for the total six month period in the prior quarter.  There was no explanation given for this discrepancy.  It is clear that Bordynuik, at a minimum, changed the accounting for the cost of sales and those changes certainly made the income statement look more "juicy."  But it is not altogether clear that the P2O costs of sales reported accurately reflect JBI's P2O operations, especially since the

---

[5] *Id.*

[6] *Id.*

total P2O cost of sales is even less than the lease of a recycling facility he leased just a year earlier and which is housed under the P2O division umbrella.[7]

75.     Between July 2011 and January 2012, Bordynuik also purportedly struck three new P2O deals.   One was with major paperboard company Rock-Tenn to build P2O sites on Rock-Tenn's property in order to process Rock-Tenn's plastic-containing waste.   It was a no-risk, no obligation deal for Rock-Tenn but the press release Bordynuik put out shot JBI's stock up by 50%.   According to an analyst who claims he spoke with John Stakel at Rock-Tenn, who allegedly signed the agreement with Bordynuik, Stakel was asked if he knew how Bordynuik was progressing.   The response from Mr. Stakel indicated he didn't know any John Bordynuik, which was not surprising given Bordynuik's history of lying about progress in connection with P2O.[8]

76.     Coincidentally, current JBI President, CEO, and director Tony Bogolin served as Director of Finance for Recycling and Waste Solutions National Accounts at Rock-Tenn during the three-years prior to joining JBI.

77.     To date it has been over four years since Bordynuik purchased a controlling interest in the shell company which he renamed John Bordynuik, Inc.   In that time, the reported accumulated deficit indicates Bordynuik burned through $29 million in his stated quest to build P2O processors costing only $80,000 to $200,000 each.   So far, out of the 2,500 sites he said he planned to have built a "few years" out from 2009, he has built one initial site, one that currently does not appear to be anywhere close to actually producing commercially, and a recently announced third that is still in the development phase and is nowhere near commercially viable.

---

[7] *Id.*

[8] *Id.*

On January 6, 2012, Bordynuik filed a Form 8-K with the SEC indicating that over the past week, he was able to sell additional stock and warrants for another $2.8 million.  Bordynuik has given no guidance for how much additional investment he expects to need before he expects to put even one processor in operation.[9]

78.     Meanwhile, the Board has consistently sat idly by, entranced by Bordynuik's words and constricted by his controlling power over the Company, as candidly admitted to in the Company's SEC filings.

### Resolution of SEC Complaint, Resulting Fines and Penalties

79.     As mentioned above, on January 4, 2012, the SEC Complaint was filed against JBI, Bordynuik, and Baldwin.  The SEC Complaint alleged that Bordynuik and Baldwin engaged in a scheme to commit securities and accounting fraud by stating materially false and inaccurate financial statements of JBI for the third and fourth quarters of 2009.  These statements regarded the overvaluing of the Media Credits and their relation to two PIPEs.

80.     On January 23, 2013, a final judgment in the SEC Action was entered as to defendants JBI and Bordynuik.  In the final judgment, JBI was forced to pay a civil penalty of $150,000, Bordynuik was forced to pay a civil penalty of $110,000, and Bordynuik was prohibited from acting as an officer or director of any publicly trading company for five years.

81.     Upon the initial agreement of the settlement that eventually became the final judgment, on May 15, 2012, Bordynuik was forced to relinquish his positions of President, CEO, and director and to retreat to the position of Chief of Technology.

82.     The SEC Action against Baldwin has not yet been resolved and remains pending.

---

[9] *See* http://seekingalpha.com/article/319080-john-bordynuik-revolutionary-company-or-can-of-worms

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

83.     Plaintiff brings this action derivatively in the right and for the benefit of JBI to redress injuries suffered, and to be suffered, by JBI as a direct result of the breaches of fiduciary duty by the Individual Defendants.  JBI is named as a nominal defendant solely in a derivative capacity.

84.     Plaintiff is a shareholder of JBI, was a shareholder of JBI at the time of the wrongdoing alleged herein, and has been a shareholder of JBI continuously since that time.

85.     Plaintiff will adequately and fairly represent the interests of JBI in enforcing and prosecuting its rights.

86.     At the time this verified shareholder derivative complaint was filed, the Board was comprised of two directors: JBI's President and CEO Bogolin and JBI's CFO Ingham.  As a result of the facts set forth herein, Plaintiff did not make any demand on the Board to institute this action against the Individual Defendants.  Such a demand would have been a futile, wasteful, and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

87.     Plaintiff did not make any demand on the Board to institute this action because such a demand would have been a futile, wasteful, and useless act since the entire Board would be incapable of evaluating such a demand in a disinterested and independent manner. Specifically, none of the directors is capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the following reasons.

88.     First, a pre-suit demand is excused because neither Bogolin nor Ingham is even arguably independent.  Both Bogolin and Ingham are Company insiders due to their executive positions.  Indeed, in the Company's latest filed proxy filed June 20, 2012, of which Ingham was

up for re-election as a director, the Company admitted that according to NASDAQ standards, Ingham did not qualify as an independent director,[10] excluding Ingham when naming independent members of the Board, stating:

> ***Our Board of Directors is currently composed of three (3) members. John Wesson qualifies as an independent director in accordance with the published listing requirements of the NASDAQ Capital Market. The NASDAQ independence definition includes a series of objective tests, such as that the director is not, and has not been for at least three years, one of our employees*** and that neither the director nor any of his or her family members has engaged in various types of business dealings with us. In addition, as further required by NASDAQ rules, our Board of Directors has made an affirmative determination as to each independent director that no relationships exist which, in the opinion of our Board of Directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. In making these determinations, our directors reviewed and discussed information provided by the directors and us with regard to each director's business and personal activities as they may relate to us and our management.

(emphasis added).

89.     Second, Bogolin and Ingham were personally appointed as directors and to their executive officer positions of CEO and CFO, respectively, by Bordynuik since he is JBI's controlling shareholder, owning 50.65% of the voting power. As candidly admitted in the 2013 Form 10-K by the Company when discussing Bordynuik's "significant degree of influence" at the Company:

> ***[Bordynuik] is able to exert a significant degree of influence over matters requiring shareholder approval, including the election of directors, any amendments to our articles or by-laws and significant corporate transactions. The interests of this concentration of ownership may not always coincide with the Company's interests or the interests of other stockholders.*** For instance, officers, directors, and principal stockholders, acting together, could cause the Company to enter into transactions or agreements that it would not otherwise consider. Similarly, this concentration of ownership may have the effect of delaying or preventing a change in control of the Company otherwise favored by

---

[10] Notably, at this time Bogolin had not yet been appointed as a member of the Board. If he had been, similar to Ingham, the Company would also have had to admit that Bogolin is not independent due to his executive position.

our other stockholders. This concentration of ownership could depress our share price.

(emphasis added).

90.     It is clear that Bogolin and Ingham serve on the Board at Bordynuik's pleasure since he is able to appoint and remove any director of his choosing.  Thus, Bogolin and Ingham's affiliation with Bordynuik and their business relationship with the Company prevent them from independently considering a demand.

91.     Moreover, Ingham is clearly beholden to Bordynuik for other reasons.  According to a Schedule 13D/A filed with the SEC on May 23, 2012, on April 12, 2012, Borydnuik transferred 400,000 shares of JBI stock to Ingham.   According to the Schedule 13D/A, the transfer of the shares to Ingham were a "gift[ ] and no consideration was received by [Bordynuik] in connection with the transactions." The value of this gift at the time was worth approximately $456,000.[11] Furthermore, it was given for no legitimate business reason and in the words of Bordynuik for "no consideration." This is not surprising given the purpose of the gift is influence and undoubtedly loyalty.  Given the fact of this gift, it is clear that Bordynuik has the ability to leverage the relationship and goodwill he has with Ingham to his own advantage. Ingham alone benefited from this gift and he clearly did not share those benefits equally with JBI's other shareholders. Thus, Bordynuik's history of granting excessive gifts to Ingham demonstrates that Ingham is not independent of Bordynuik such that Ingham is unable to independently consider a demand against Bordynuik.

92.     Third, neither Bogolin nor Ingham will commence and vigorously prosecute this action against Bordynuik because the substantial compensation they receive as CEO and CFO, respectively, is based on the success of P2O.  For example, the Company's most recent proxy

---

[11] According to Yahoo Finance, JBI's stock price was trading at $1.14 on April 12, 2012.

statement filed June 20, 2012 with the SEC states that the top incentive based compensation milestone according to the Company is "P2O Operational Status."  Thus, the Company's reliance on Bordynuik's knowledge of the P2O process is essential to any progression in the P2O process and that reliance as well as its direct effect on Bogolin and Ingham's compensation prevent them from disinterestedly and independently considering a demand against Bordynuik.

93.     Indeed, JBI's reliance on Bordynuik is succinctly summarized in the Company's 2013 Form 10-K which states:

> *Our future success is dependent, in part, on the performance and continued service of John Bordynuik, and on being able to attract and retain qualified management and personnel.*
>
> *We are presently dependent to a great extent upon the experience, knowledge and abilities of John Bordynuik, our founder and current Chief of Technology. Mr. Bordynuik has been critical to the development of our P2O business, and the loss of his services could have a material adverse effect on our business, financial condition or results of operations, and could also significantly limit our growth potential.*
>
> We will also require additional expertise in specific areas applicable to our P2O business and will require the addition of new personnel, and the development of additional expertise by existing personnel. The inability to attract talented personnel with appropriate skills or to develop the necessary expertise could impair our ability to develop and grow our business.
>
> The loss of any key members of our management team or the failure to attract or retain qualified management and personnel who possess the requisite expertise for the conduct of our business could prevent us from further developing our businesses according to our current strategy.  We may be unable to attract or retain qualified personnel in the future due to the intense competition for qualified personnel amongst technology-based businesses, or due to the unavailability of personnel with the qualifications or experience necessary for our business. Competition for business, financial, technical and other personnel from numerous companies and academic and other research institutions may limit our ability to attract and retain such personnel on acceptable terms. If we are unable to attract and retain the necessary personnel to accomplish our business objectives, we may experience staffing constraints that will adversely affect our ability to meet the demands of our industrial partners and customers in a timely fashion or to support continued development of our P2O business.

(emphasis added).

94.     Moreover, the Company only derives revenue from two sources, P2O and Data

business, both of which are completely dependent on Bordynuik, per the 2013 Form 10-K:

> ### Data Recovery & Migration Business
>
> In 2009 the Company purchased the Data Recovery & Migration Assets ("Data Assets") from John Bordynuik, Inc., thereby providing the Company with the ability to operate what was once John Bordynuik, Inc.'s data restoration and recovery business. This was a business originally developed by our founder, John Bordynuik in 2006.
>
> The Data Recovery & Migration Business is not as capital intensive as the other businesses of JBI, but is time consuming with regards to the allocation of the time of John Bordynuik, our founder. ***Revenues for this segment will vary based on the availability of Mr. Bordynuik to dedicate portions of his time to reading and interpreting the data from our customers' media.***
>
> ### Revenue
>
> ***Revenue is primarily derived from our P2O business through the sale of our fuels and processed waste paper fiber. Additionally, from time to time, we are able to supplement this revenue with revenue from our Data Business through reading and interpreting magnetic tape media, dependent on the time constraints of our founder, John Bordynuik.***

(emphasis added).

95.     Bogolin and Ingham's principal professional occupations are as JBI's CEO and

CFO, respectively, and therefore their annual compensation, which amounts to hundreds of

thousands of dollars each, hinges on how well the Company financially performs.   Bogolin and

Ingham could not reasonably consider a demand against Bordynuik because the Company's

viability, present financial condition and future success are tied to Bordynuik.   Indeed, the

Company admits that its revenue is wholly dependent on Bordynuik since he is the one

principally involved in both streams of revenue.   Thus, the livelihood of Bogolin and Ingham is

dependent on Bordynuik such that they could not independently consider a demand against him.

<u>**COUNT I**</u>
<u>**Against All Individual Defendants for Breach of Fiduciary Duty**</u>

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     The Individual Defendants owed and owe JBI fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe JBI the highest obligation of good faith, fair dealing, loyalty, and due care.

98.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

99.     Each of the Individual Defendants had actual knowledge of JBI's improper accounting of the Media Credits, as well as Defendant Bordynuik's repeated falsehoods about the ability of JBI to deliver the ability to move forward with the P2O process.  The Individual Defendants' failure to heed the concerns raised the Company's treatment of the Media Credits, the use of Gately, LLC, and the falsehoods put forth by Defendant Bordynuik could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

100.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, JBI has sustained significant damages, including, but not limited to, the costs associated with restating JBI's financial statements, the cost of defending the SEC Action, including any indemnification costs for Bordynuik and Baldwin, the $150,000 fine levied against the Company as a result of the final judgment in the SEC suit, the cost of defending the Securities Class Action and the impending amount of settlement, and the costs incurred for finding and recruiting new executives and directors due to the removals required by the SEC final judgment.

101.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

102.    Plaintiff, on behalf of JBI, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  June 24, 2014

**PASTOR LAW OFFICE, LLP**

/s/ David Pastor
David Pastor (BBO # 391000)
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone:  617-742-9700
Facsimile:  617-742-9701

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone:  212-983-9330
Facsimile:   212-983-9331

and

**HYNES KELLER &**
**HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
1150 First Avenue
Suite 501
King of Prussia, PA 19004
Telephone:  610-994-0292
Facsimile:   914-752-3041

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 24, 2014.

/s/ David Pastor
David Pastor